## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. _____ ) ) JURY TRIAL DEMANDED |
| DELTA NATURAL GAS COMPANY, INC., GLENN R. JENNINGS, LINDA K. BREATHITT, JACOB P. CLINE, III, SANDRA C. GRAY, EDWARD J. HOLMES, MICHAEL J. KISTNER, FRED N. PARKER, RODNEY L. SHORT, ARTHUR E. WALKER, JR., PEOPLES NATURAL GAS, PNG COMPANIES LLC, DRAKE MERGER SUB INC., AND STEELRIVER INFRASTRUCTURE FUND NORTH AMERICA LP, | ) CLASS ACTION ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action stems from a proposed transaction announced on February 21, 2017 (the "Proposed Transaction"), pursuant to which Delta Natural Gas Company, Inc. ("Delta" or the "Company") will be acquired by affiliates of Peoples Natural Gas and SteelRiver Infrastructure Fund North America LP.

2.     On February 20, 2017, Delta's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger

Agreement") with PNG Companies LLC ("Parent") and Drake Merger Sub Inc. ("Merger Sub," and together with Parent, Peoples Natural Gas, and SteelRiver Infrastructure Fund North America LP, "PNG").  Pursuant to the terms of the Merger Agreement, shareholders of Delta will receive $30.50 per share in cash.

3.      On March 24, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the

owner of Delta common stock.

9.      Defendant Delta is a Kentucky corporation and maintains its principal executive office at 3617 Lexington Road, Winchester, Kentucky 40391.  Delta's common stock is traded on the Nasdaq GS under the ticker symbol "DGAS."

10.     Defendant Glenn R. Jennings ("Jennings") has served as a director of Delta since 1984 and is Chairman of the Board, President, and Chief Executive Officer ("CEO") of the Company.

11.     Defendant Linda K. Breathitt ("Breathitt") has served as a director of Delta since 2015 and previously served as a director from 2007 to 2012.  Breathitt is a member of the Audit Committee.

12.     Defendant Jacob P. Cline, III ("Cline") has served as a director of Delta since 2014.  Cline is a member of the Audit Committee.

13.     Defendant Sandra C. Gray ("Gray") has served as a director of Delta since 2012.  Gray is Chair of the Corporate Governance and Compensation Committee and a member of the Executive Committee.

14.     Defendant Edward J. Holmes ("Holmes") has served as a director of Delta since 2012.  Holmes is a member of the Corporate Governance and Compensation Committee.

15.     Defendant Michael J. Kistner ("Kistner") has served as a director of Delta since 2002.  Kistner is Chair of the Audit Committee and a member of the Executive Committee.

16.     Defendant Fred N. Parker ("Parker") has served as a director of Delta since 2014.  Parker is a member of the Corporate Governance and Compensation Committee.

17.     Defendant Rodney L. Short ("Short") has served as a director of Delta since 2015.  Short is a member of the Audit Committee.

18.     Defendant Arthur E. Walker, Jr., ("Walker") has served as a director of Delta since 1981.  Walker is a member of the Corporate Governance and Compensation Committee.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Peoples Natural Gas is the largest natural gas distribution company in Pennsylvania.

21.     Defendant SteelRiver Infrastructure Fund North America LP controls Peoples Natural Gas.

22.     Defendant Parent is a Delaware limited liability company and a party to the Merger Agreement.

23.     Defendant Merger Sub is a Kentucky corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Delta (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

25.     This action is properly maintainable as a class action.

26.     The Class is so numerous that joinder of all members is impracticable.  As of February 15, 2017, there were approximately 7,128,472 shares of Delta common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

27.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm

plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

28.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

<u>SUBSTANTIVE ALLEGATIONS</u>

***Background of the Company and the Proposed Transaction***

31.     Delta is a natural gas company that distributes or transports natural gas to approximately 36,000 customers located in central and southeastern Kentucky.  The Company also owns and operates an underground natural gas storage field in southeastern Kentucky.

32.     Delta operates through two segments:  a regulated segment and a non-regulated segment.

33.     Through its regulated segment, the Company distributes natural gas to its retail customers in 23 predominantly rural counties.  In addition, Delta's regulated segment transports natural gas to large-volume customers on its system who purchase their natural gas in the open market.  The Company's regulated segment also transports natural gas on behalf of local producers and other customers not on its distribution system.  The Kentucky Public Service Commission exercises regulatory authority over the Company's retail natural gas distribution and transportation services.

34.     Delta's non-regulated segment includes three wholly-owned subsidiaries:  Delta Resources, Inc. ("Delta Resources"), Delgasco, Inc. ("Delgasco"), and Enpro, Inc. ("Enpro"). Delta Resources buys natural gas and resells it to industrial or large-volume customers on Delta's system.  Delgasco buys natural gas and resells it to Delta Resources and to customers not on Delta's system.  Enpro owns and operates natural gas production properties and undeveloped acreage.

35.     On February 3, 2017, the Company filed a Form 10-Q with the SEC reporting its financial results for the three and six months ended December 31, 2016.

36.     For the three months ended December 31, 2016, total operating revenues were $18,936,843 compared to $16,673,347 for the three months ended December 31, 2015.  Net income was $2,443,603 compared to $1,803,351 for the three months ended December 31, 2015, and earnings per common share were $0.34 compared to $0.25.

37.     For the six months ended December 31, 2016, total operating revenues were $29,445,040 compared to $27,066,770 for the six months ended December 31, 2015.  Net income was $1,985,619 compared to $1,278,894 for the six months ended December 31, 2015, and earnings per common share were $0.28 compared to $0.18.

38.     Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

39.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 5.3(a) of the Merger Agreement states:

(a) The Company agrees that it shall, and shall cause its Subsidiaries and its and its Subsidiaries' respective directors, officers and employees to, and shall use its reasonable best efforts to cause its other Representatives to, immediately cease all existing activities, discussions or negotiations with any Person conducted on or before the date of this Agreement with respect to any Takeover Proposal or any inquiry or proposal that could reasonably be expected to lead to a Takeover Proposal. The Company shall promptly (and in any event no later than 5:00 p.m. eastern time on the third (3rd) Business Day following the date hereof) request in writing each Person who has heretofore executed a confidentiality agreement in connection with its consideration of acquiring the Company or any portion thereof (and such confidentiality agreement was entered into within the one (1) year period prior to the date of this Agreement) to return or destroy all confidential information heretofore furnished to such Person by or on behalf of the Company, and the Company shall use commercially reasonable efforts to have such information returned or destroyed (to the extent destruction of such information is permitted by such confidentiality agreement). Except as otherwise provided in this Agreement, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 7.1, the Company shall not, and shall cause its Subsidiaries and its and its Subsidiaries' respective directors, officers and employees not to, and shall use its reasonable best efforts to cause its other Representatives not to (and shall not authorize or permit any of them to), directly or indirectly, (i) solicit, initiate, knowingly encourage or knowingly facilitate any Takeover Proposal or the making, submission, announcement or consummation thereof, (ii) participate or engage in any discussions or negotiations regarding, or furnish to any Person any non-public information or access relating to the Company or any of its Subsidiaries in connection with, any Takeover Proposal or any inquiry or proposal that could reasonably be expected to lead to a Takeover Proposal, (iii) execute or enter into any Company Acquisition Agreement, or (iv) terminate, amend, modify, waive or fail to enforce any rights under any "standstill" or other similar

agreement between the Company or any of its Subsidiaries and any Person (other than Parent or Merger Sub), except, with respect to this clause (iv), (A) to the extent that prior to the receipt of the Company Shareholder Approval the Company Board concludes in good faith, after consultation with its financial advisor and outside legal counsel, the failure to take such action would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law or (B) to the extent that any standstill provision in any agreement to which the Company or any of its Subsidiaries is a party includes a "fall-away" or other similar provision that causes such standstill provision to be terminated, amended, modified or waived as a result of the Company entering into or publicly announcing this Agreement in and of themselves.

40. Further, the Company must promptly advise PNG of any proposals or inquiries received from other parties. Section 5.3(e) of the Merger Agreement states:

(e) In addition to the obligations of the Company set forth in Section 5.3(b), the Company shall promptly, and in all cases within twenty-four (24) hours of actual receipt by the Company's President and Chief Executive Officer, advise Parent in writing of (i) any request for information that the Company believes or should reasonably expect would be used for the purposes of making, submitting or announcing a Takeover Proposal, or (ii) any inquiry that constitutes or would reasonably be expected to lead to, any Takeover Proposal, the content of such request or inquiry, and the identity of the Person or group making any such request or inquiry (except to the extent the Company is prevented from doing so by a Prior Confidentiality Agreement). The Company shall keep Parent promptly (and in all cases within twenty-four (24) hours after actual receipt by the Company's President and Chief Executive Officer) informed of the status, details, terms and conditions (including all amendments or proposed amendments) of any such request or inquiry, and shall promptly (and in all cases within twenty-four (24) hours after actual receipt by the Company's President and Chief Executive Officer) provide Parent with copies of all documents and material written or electronic communications relating to any such request or inquiry exchanged between the Company or any Representative of the Company, on the one hand, and the Person from which such request or inquiry was received (or such Person's Representatives), on the other hand.

41. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants PNG a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.3(d) of the Merger Agreement provides, in relevant part:

(d) Notwithstanding anything to the contrary in this Agreement, at any time prior to obtaining the Company Shareholder Approval, the Company Board (or a duly authorized committee thereof) may make a Company Adverse Recommendation Change (and terminate this Agreement pursuant to Section 7.1(d)(ii)), if and only if (i) (A) a Company Intervening Event has occurred, or (B) the Company has received a Superior Proposal that did not result from a Facilitating Breach, and, in each case, the Company Board or a duly authorized committee thereof determines in good faith (after consultation with outside legal counsel and after considering in good faith any proposal made by Parent pursuant to clause (ii) below) that the failure to make a Company Adverse Recommendation Change as a result of the occurrence of such Company Intervening Event or in response to the receipt of such Superior Proposal, as the case may be, would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law and (ii) (A) the Company provides Parent prior written notice of its intent to make any Company Adverse Recommendation Change and terminate this Agreement pursuant to Section 7.1(d)(ii) no less than four (4) Business Days prior to taking such action to the effect that, absent any modification to the terms and conditions of this Agreement, the Company Board has resolved to effect a Company Adverse Recommendation Change and to terminate this Agreement pursuant to Section 7.1(d)(ii), which notice shall specify the basis for such Company Adverse Recommendation Change and termination and attaching the most current draft of any Company Acquisition Agreement with respect to the Superior Proposal (redacted, if necessary, as required by a Prior Confidentiality Agreement) (or, if no such draft exists, a summary of the material terms and conditions of such Superior Proposal), if applicable, and (except to the extent prevented by a Prior Confidentiality Agreement) the identity of the Person making such Superior Proposal (a "Notice of Recommendation Change") (it being understood that such Notice of Recommendation Change shall not in itself be deemed a Company Adverse Recommendation Change and that any change in price or material revision or amendment to any of the terms of a Superior Proposal, if applicable, shall require a new notice to which the provisions of clauses (ii)(A), (B) and (C) of this Section 5.3(d) shall apply mutatis mutandis except that, in the case of such a new notice, all references to four (4) Business Days in this Section 5.3(d) shall be deemed to be two (2) Business Days), (B) during such four (4) Business Day period, if requested by Parent, the Company shall, and shall make its Representatives reasonably available, to negotiate in good faith with Parent and its Representatives regarding any modifications to the terms and conditions of this Agreement that Parent proposes to make, and (C) at the end of such four (4) Business Day period and taking into account, in good faith, any modifications to the terms of this Agreement proposed by Parent to the Company in a written and binding offer, the Company Board determines in good faith (after consultation with its financial advisor of national recognized standing (which shall include Tudor Pickering Holt & Co.) and its outside legal counsel) that the failure to make such a Company Adverse Recommendation Change and terminate of this Agreement pursuant to Section 7.1(d)(ii) would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law, and that, in the case of

a Company Adverse Recommendation Change and termination of this Agreement pursuant to Section 7.1(d)(ii) with respect to a Takeover Proposal, such Takeover Proposal still constitutes a Superior Proposal.

42.     Further locking up control of the Company in favor of PNG, the Merger Agreement provides for a "termination fee" of $4,340,000, payable by the Company to PNG if the Individual Defendants cause the Company to terminate the Merger Agreement.

43.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

44.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

45.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

46.     The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

47.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

48.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

49.     For example, the Company's five named executive officers stand to receive over $14.7 million in change-in-control payments in connection with the Proposed Transaction.

50.     Additionally, according to the press release announcing the merger, one member of the Board will be retained by the post-transaction company.

10

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

51.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

52.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

53.     First, the Proxy Statement omits material information regarding Delta's financial projections and the financial analyses performed by the Company's financial advisor, Tudor, Pickering, Holt & Co. Advisors, LLC ("TPH"), in support of its so-called fairness opinion.

54.     With respect to Delta's financial projections, the Proxy Statement fails to disclose, *inter alia*: (i) Delta's estimated future cash flows; (ii) capital expenditures; (iii) changes in net working capital; (iv) stock-based compensation; and (v) a reconciliation of all non-GAAP to GAAP metrics.

55.     With respect to TPH's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) Delta's estimated future cash flows; (ii) the corresponding definition of future cash flows and constituent line items; and (iii) the terminal value of Delta.

56.     With respect to TPH's *Dividend Discount Model Analysis*, the Proxy Statement fails to disclose:  (i) the dividend projections provided by Company management; (ii) the range of terminal values; (iii) TPH's basis for applying terminal dividend growth rates ranging from 0.0% to 2.0% to the ninth year's estimated dividend rate; (iv) the ninth year's estimated dividend rate as provided by Company management; and (v) TPH's basis for using levered discount rates ranging from 5.5% to 6.5%.

57.     With respect to TPH's *Present Value of Price/Earnings Multiple-Implied Future Share Price Analysis*, the Proxy Statement fails to disclose:  (i) TPH's basis for selecting 2019

and 2024 as the "observed years"; (ii) the implied dividends as provided by Company management; and (iii) the total number of implied future shares owned and total future values of the implied future share prices.

58.     With respect to TPH's *Selected Comparable Company Multiples Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by TPH in the analysis.

59.     With respect to TPH's *Selected Comparable Transaction Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by TPH in the analysis.

60.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

61.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of Our Board; Reasons for Recommending Approval of the Merger Agreement"; (iii) "Certain Unaudited Forecasted Financial Information"; and (iv) "Opinion of Tudor, Pickering, Holt & Co. Advisors, LLC."

62.     Second, the Proxy Statement omits material information regarding potential conflicts of interest of TPH.

63.     For example, the Proxy Statement fails to disclose whether TPH has performed services for PNG or its affiliates in the past two years, as well as the compensation received for such services.

64.     The Proxy Statement fails to disclose the amount of TPH's fee that is contingent upon consummation of the Proposed Transaction.

65.     The Proxy Statement further fails to disclose TPH's holdings in PNG's and its affiliates' stock.

66.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

67.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of Our Board; Reasons for Recommending Approval of the Merger Agreement"; and (iii) "Opinion of Tudor, Pickering, Holt & Co. Advisors, LLC."

68.     Third, the Proxy Statement fails to disclose whether the confidentiality agreements entered into between Delta and prospective bidders contained standstill and/or "don't ask, don't waive" provisions that were or are preventing those counterparties from submitting superior offers to acquire the Company.

69.     Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are permitted to do so, when in fact they are contractually prohibited from doing so.

70.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background

of the Merger"; and (ii) "Recommendation of Our Board; Reasons for Recommending Approval of the Merger Agreement."

71.     Fourth, while one member of the Board will be retained by the post-transaction company, the Proxy Statement fails to disclose the timing and nature of all communications regarding future directorship and/or employment of Delta's directors and officers, including who participated in all such communications.

72.     This information is necessary for stockholders to understand potential conflicts of interest of the Board and management, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

73.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of Our Board; Reasons for Recommending Approval of the Merger Agreement"; and (iii) "Interests of Directors and Executive Officers in the Merger."

74.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Delta's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Delta

75.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Delta is liable

14

as the issuer of these statements.

77.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

78.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

79.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

80.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

81.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

82.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and PNG**

83.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.     The Individual Defendants and PNG acted as controlling persons of Delta within the meaning of Section 20(a) of the 1934 Act as alleged herein.   By virtue of their positions as

officers and/or directors of Delta and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

85.     Each of the Individual Defendants and PNG was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly in the making of the Proxy Statement.

87.     PNG also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

88.     By virtue of the foregoing, the Individual Defendants and PNG violated Section 20(a) of the 1934 Act.

89.     As set forth above, the Individual Defendants and PNG had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their

positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: April 28, 2017                    **STRAUSE LAW GROUP, PLLC**

                                     By:   _/s/ Randall S. Strause_
                                           Randall S. Strause
**OF COUNSEL:**                            804 Stone Creek Pkwy, Suite 1
                                           Louisville, KY 40223
**RIGRODSKY & LONG, P.A.**                 (502) 426-1661
Brian D. Long                              rstrause@strauselawgroup.com
Gina M. Serra
2 Righter Parkway, Suite 120               *Attorneys for Plaintiff*
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800